IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs at Knoxville September 15, 2015

**TIMOTHY SHANE HIXSON v. STATE OF TENNESSEE**

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2010-B-1676    Cheryl Blackburn, Judge**

---

**No. M2015-00065-CCA-R3-PC – Filed December 17, 2015**

---

The Petitioner, Timothy Shane Hixson, appeals the Davidson County Criminal Court's denial of his petition for post-conviction relief from his conviction of aggravated robbery and resulting twenty-four-year sentence. On appeal, the Petitioner contends that he received the ineffective assistance of trial counsel. Based upon the record and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ALAN E. GLENN and D. KELLY THOMAS, JR., JJ., joined.

Elaine Heard, Nashville, Tennessee, for the appellant, Timothy Shane Hixson.

Herbert H. Slatery III, Attorney General and Reporter; Clarence E. Lutz, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Jeff Burks, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

In its direct appeal opinion, this court summarized the evidence at trial as follows: Shamal Harley, a student at Nashville Auto Diesel College, testified that on the night of February 20, 2010, he was walking home from a party and encountered a Chevrolet Avalanche with three people inside on the side of the road. State v. Timothy Shane Hixson, No. M2012-02357-CCA-R3CD, 2013 WL 4082354, at *1 (Tenn. Crim. App. at Nashville, Aug. 14, 2013). Harley spoke briefly with the driver. Id. Meanwhile, the

front-seat passenger got out of the vehicle. Id. After speaking with the driver, Harley turned and was walking away when the front-seat passenger grabbed him from behind, put a knife to his throat, and demanded his wallet. Harley reached up and touched the knife and gave the wallet to him. Id. The robber returned to the vehicle, and the truck left the area. Later that night, police officers found the Avalanche only one or two miles from the scene of the robbery. Id.

A police officer drove Harley to the truck, and he recognized it as the one involved in the crime. Id. He also recognized all three of the vehicle's occupants and identified the Petitioner as the front-seat passenger. Id. at *1-2. Harley had reported seeing a wheelchair in the vehicle, and the police noticed a wheelchair in the back seat. Id. at *2. They also recovered Harley's wallet at the scene and found a knife and some loose credit cards inside the truck. Id. at *1, 2. On cross-examination, Harley denied that he saw the Petitioner walking with a cane during the robbery but acknowledged that he did not actually see the Petitioner brandish a knife. Id. at *2. One of the officers who had found the Avalanche testified that he asked the driver to step out of the vehicle and that the driver claimed he needed the wheelchair due to a disability. Id. at *3. On cross-examination, the officer acknowledged that he saw the Petitioner with a cane that night. Id.

The Petitioner testified on his own behalf, stating as follows:

> [He] drove to an area near the Nashville Auto Diesel College and encountered Mr. Harley walking down the street. The [Petitioner] asked Mr. Harley if "he know[s] where [the Petitioner] can get any pills," and, according to the [Petitioner], Mr. Harley responded that his "buddy" had some for $10 each. The [Petitioner] told Mr. Harley that he would like to purchase three pills, and Mr. Harley explained that he needed the $30 up front. When the [Petitioner] was hesitant to give him the cash, Mr. Harley offered to let the [Petitioner] hold his wallet until he returned with the pills. The [Petitioner] acquiesced, giving Mr. Harley $30 and accepting his wallet in return. Mr. Harley instructed the [Petitioner] to "make the block a couple of times," and Mr. Harley left.

> The [Petitioner] testified that he drove around the area for 15 to 20 minutes but that he began to worry that he would be stopped by law enforcement officers because he was in an area known for drug dealing. The [Petitioner] then decided to drive to Granada, where he encountered Mr. Rogers, known

as "Wheelchair," sitting in his new Chevrolet Avalanche. Mr. Rogers offered to take the [Petitioner] for a ride in the vehicle, and the [Petitioner] climbed into the front passenger's seat. At that time, Ms. Pasquini exited her residence on Granada and climbed into the backseat of the vehicle, where she "pass[ed] out" due to intoxication.

At the [Petitioner's] request, Mr. Rogers drove to the area of the Nashville Auto Diesel College, where the [Petitioner] spotted Mr. Harley. The [Petitioner] exited the vehicle with a buck knife "on his side," but he testified that he never pulled the knife on Mr. Harley. The [Petitioner] asked Mr. Harley if he had the pills, and Mr. Harley asked if the [Petitioner] had his wallet. The [Petitioner] held out the wallet, and, according to the [Petitioner], Mr. Harley grabbed the wallet and attempted to run away. The [Petitioner], however, did not release the wallet, causing him to fall on top of Mr. Harley. At that point, Ms. Pasquini exited the vehicle and began yelling for Mr. Harley to stop. Mr. Harley got up and ran off down the street, leaving his wallet with the [Petitioner]. Ms. Pasquini helped the [Petitioner] back into the vehicle. The trio returned to Granada, and Ms. Pasquini went into her residence. The [Petitioner] and Mr. Rogers remained in the vehicle, where the [Petitioner] examined the contents of Mr. Harley's wallet. At that time, law enforcement officers arrived, and the [Petitioner] was placed under arrest a short time later.

On cross-examination, the [Petitioner] admitted that, in the past 10 years, he had been thrice convicted of aggravated burglary, as well as burglary, burglary of an automobile, theft of property valued over $1000, and unauthorized use of a motor vehicle.

Id. at *3-4.

The Petitioner appealed to this court, arguing, in pertinent part, that the evidence was insufficient to support his conviction because he walked with a cane and, therefore, was physically unable to commit the crime. Id. at *4. This court affirmed the conviction, stating that

Mr. Harley positively identified the [Petitioner] as the man who had robbed him. Although the [Petitioner] claims that he was walking with the aid of a cane and could not have robbed the victim in the way in which the victim claimed, the jury heard the [Petitioner's] testimony and clearly rejected it, as was their prerogative.

Id. at *5. Subsequently, the Petitioner filed a timely petition for post-conviction relief, alleging that he received the ineffective assistance of trial counsel. The post-conviction court appointed counsel, and counsel filed an amended petition, arguing that trial counsel was ineffective because he failed to consult with the Petitioner, failed to call witnesses in the Petitioner's defense, and failed to present evidence of the Petitioner's disability as a defense to the crime.

At the evidentiary hearing, the Petitioner testified that trial counsel represented him for almost two years but that they "never spent more than ten or fifteen minutes together." Counsel met with the petitioner about six times when the Petitioner went to court, but counsel never met with him outside of court. The Petitioner said that counsel never discussed any motions with him and that they "never went over [his] case really other than five minutes here and five minutes there every time [he came] to Nashville." Counsel and the Petitioner were supposed to have a video conference the week before trial, but it had to be canceled due to technical difficulties.

The Petitioner testified that at the time of the crime, he had a broken leg and could not walk without a cane. The Petitioner had another lawyer send his medical records to counsel before trial, but counsel "never even brought them to court." On the night of the Petitioner's arrest, a police officer took him to the hospital. The Petitioner identified his medical records from the hospital visit, claiming that they showed he had a broken leg and received pain injections.[1] However, counsel did not use the records at trial. Counsel also did not investigate whether video surveillance from Nashville Auto Diesel College recorded the crime, which "would have exonerated [the Petitioner] right then and there," and never obtained any video that showed the Petitioner being helped into the justice center and receiving crutches because he could not walk. At trial, counsel kept asking the State's witnesses if they recalled seeing the Petitioner with a cane, and they said no.

The Petitioner testified that when the State presented the knife to the jury, he knew the knife was not his. Counsel never had the knife tested for fingerprints and never hired a private investigator. The Petitioner said that he never should have testified at trial but acknowledged that counsel warned him about the consequences of testifying.

---

[1] The medical records were not introduced into evidence.

On cross-examination, the Petitioner testified that he was "in the wrong" on the night of the robbery for trying to buy drugs from Harley. He acknowledged that he had a lengthy criminal history but said that he had always pled guilty because he was guilty. In this case, though, he did not commit the crime. The Petitioner acknowledged that the jury heard about his "medical situation" but said that he did not think the jurors listened to the evidence in light of his criminal record. He acknowledged that the trial court held a hearing before trial and determined that the State could ask him about some of his prior convictions. The Petitioner also acknowledged that he knew he did not have to testify but said that he thought he had no choice given that "nothing was even said in court" to defend him.

Trial counsel testified for the State that he had been practicing law since 2005 and was appointed to represent the Petitioner for the Petitioner's preliminary hearing. Counsel requested and received discovery from the State and "mailed a couple of copies of it" to the Petitioner. Counsel and the Petitioner also discussed the discovery materials and the evidence against the Petitioner when they were in court. Counsel said he had no reason to file a motion to suppress evidence because "[t]he showup was done correctly" and "the true facts of this case were pretty tight." Although counsel did not file a motion to suppress, he filed seven motions in limine.

Trial counsel testified that he obtained and reviewed the Petitioner's medical records. An attorney that had represented the Petitioner in a civil case also gave counsel some records. Counsel had a medical professional, whom he described as "an acquaintance of mine," review the records, and counsel and the Petitioner "discussed the issues" related to the Petitioner's physical condition. Counsel said he "determined that it would not be in [the Petitioner's] best interest to proceed forward with trying to put on as a medical defense." Counsel knew that a police officer had taken the Petitioner to the hospital on the night of his arrest and cross-examined the police officer about it. However, the officer "did not recall" taking the Petitioner to the hospital. Counsel advised the Petitioner not to testify, but the Petitioner decided to take the stand. Subsequently, the trial court advised the Petitioner about his decision to testify during a Momon hearing. Counsel said the Petitioner was on parole at the time of the crime, "so anything he would get by law was going to run consecutive."

On cross-examination, trial counsel testified that he did not hire a private investigator for this case because his own investigation "was thorough enough" and because the only witnesses he needed to interview were "the individuals that were there at the scene that night." The Petitioner asked counsel about obtaining video surveillance from Nashville Auto Diesel College, but no video related to the crime existed. Counsel did not think the Petitioner's medical condition supported his claim that he could not have committed the offense because the medical records said the Petitioner was

"ambulatory," could stand up, and could walk. Moreover, Mr. Harley had not alleged that the Petitioner ran or fought. Counsel never met with the Petitioner outside of court. Nevertheless, they "were totally able to discuss the evidence in this matter," and counsel "felt that we discussed it in the detail that was necessary for the case." After the trial, counsel attempted to have a video conference with the Petitioner, but there were technical difficulties.

In a written order, the post-conviction court denied the petition for post-conviction relief. The court accredited trial counsel's testimony that he and the Petitioner were able to discuss the case adequately, that he obtained discovery and discussed it with the Petitioner, and that no video surveillance of the crime was available. The court also accredited counsel's testimony that he was aware of the Petitioner's disability, that he obtained the Petitioner's medical records, and that he determined the records did not support the Petitioner's claim that he could not have committed the crime.

## II. Analysis

The Petitioner contends that he received the ineffective assistance of counsel because trial counsel met with him only on his court dates and the meetings lasted only ten to fifteen minutes; failed to have the knife allegedly used during the robbery tested for fingerprints; failed to present any evidence of his physical disability to the jury; failed to hire a private investigator; and failed to locate any crime scene surveillance video "despite the fact that there were facilities with external cameras nearby." The State argues that the post-conviction court properly denied the petition. We agree with the State.

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction

court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Generally, [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component. Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

Here, the post-conviction court accredited counsel's testimony that counsel met with the Petitioner, discussed the case with him, and did not need to hire a private investigator. The Petitioner has failed to show how he was prejudiced by counsel's meeting with him only during his court dates or counsel's failure to obtain an investigator's services. The trial court also accredited counsel's testimony that the Petitioner's medical records did not support his claim that he physically could not have committed the crime and that surveillance video of the crime was not available. The Petitioner has failed to include the medical records he identified from the night of his arrest in the appellate record and has offered no evidence to support his claims that fingerprint testing on the knife and surveillance video would have exonerated him. Thus, the post-conviction court properly denied the petition for post-conviction relief.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the post-conviction court.

_____
NORMA MCGEE OGLE, JUDGE